U.S. v. Combs, Ms. Lysak? Yes, good morning. Carol Lysak. Carol Lysak, appearing for the appellant, Dale Combs. Any way you look at it, this is an extremely unique drug case. Extremely unique. Pardon me? Okay. Extremely unique. Okay. Well, all right. Unique. Unique. I shouldn't be redundant. But it's an extremely unusual drug case. Dale Combs was convicted of the manufacture of in excess of 500 grams of methamphetamine, even though not a single witness testified to observing him manufacture, sell, or purchase  it. And even though DEA agents, believing that they would find a meth lab at his place of business, served a search warrant on that business, they came up with nothing. They didn't find drugs. They didn't find cash. They didn't find a meth lab. And, indeed, they didn't even find any of the indications that a meth lab had ever existed there. Nonetheless, he was convicted of this very serious offense. He was also convicted of distributing 500, in excess of 500 grams of meth, based on his paying somebody to dispose of a tub or a barrel of refuse containing only trace amounts of methamphetamine. Now, when I was reviewing the chronology of events in preparation for making this argument, it occurred to me that sort of stepping back and taking sort of a macro look at this case is important to understanding how the errors that were committed in this case were committed and how the very troubling convictions that resulted came about. So, you know, we start back in May of 2000 with a crack user, felon, drug dealer, burglar who is arrested for crack possession. This is Earl Floyd. And Floyd does what he often does, he said, when he runs out of other options and is incarcerated. He contacts law enforcement and tries to make an office to make a case against someone in exchange for help with his case, in this case an O.R. and ultimately probation. And Floyd is someone who had done odd jobs for Dale Combs in the past, and he tells the officer something that he later admits is completely false. Dale Combs is a person to whom I can always go with what he termed product and always come back with money. Now, in the course of the trial, of course, he admits that this wasn't true. But he offers to make a case for the officer showing that Dale Combs is a manufacturer of methamphetamine, and the police go with him. So he's released from custody and begins his undercover activities. And fairly shortly after that time, in August of 2000, he tells the DEA, who was also involved in this investigation at that point, that Combs has offered to pay him $100 to get rid of the two barrels in this case. And Floyd, according to Floyd's testimony, and there's really nothing to the contrary in the government's case, the barrels in question were barrels that he, Floyd, obtained from somebody else earlier that summer, saw were half full of oil, and sold to Dale Combs. So he tells the police that he's being paid to dispose of these items, picks them up from Combs, takes them out into the desert, ostensibly to dispose of them, where the DEA picks them up. They look at the material in them. They have the stuff tested. And what's inside of the barrels is one of them is just apparently a bunch of sludge and liquid and solid items containing absolutely no methamphetamine. In the other barrel, three samples show that there are traces of methamphetamine among the liquid, sludge, and solids. And the agents disclose this material. This is not the glass stuff. Tubing, plastic, black plastic trash bags, exactly. This is not the grail that the agents are looking for. So their investigation continues for a year. They surveil Combs' business. They intercept calls. They have Floyd, Earl Floyd, continues to be at the scene of the business, hoping to find evidence of manufacture. And finally, a full year later, they strike. They serve this search warrant. And one of the searching agents testifies, of course. It's his goal, it's his expectation that he's going to find a meth lab on the scene. And as we know, they found absolutely nothing. So what do they do in the face of, you know, what at minimum can be called a disappointment and perhaps an embarrassment after sort of weighing in with Floyd and giving him benefits and devoting all kinds of resources to this investigation? They go back to the stuff that they threw away a year before and attempt to cobble together a big case out of a couple of barrels of sludge. And incredibly, he's convicted of manufacture and distribution. Now, you know, how does this happen? Well, it happens because a number of outrageous errors were committed in the course of the trial. First, there is this business about it. And then they were disposed of the barrels. Correct. They were not available in evidence? No, they were disposed of because they were deemed to be hazardous material. One other question about the barrels. You say that Floyd gave them to the defendant. He purchased these barrels from Floyd? Yes. And then he told Floyd to throw them away? Later on. Were they used for anything in the interim? I'm sorry? Was there any purpose or use for them in the interim? Well, Combs had an automotive shop. So I think Floyd believed that the oil would be useful to Combs. In other words, it was sort of discarded oil lying around some other industrial area that was owned by somebody else who Floyd occasionally worked for. And he asked this man here, can I take this old oil, used oil, can I take it? I'll take it off your property. And then he sells it for, I guess, some small amount to Dale Combs. So it was Floyd's testimony that these barrels that the DEA ultimately seized were the same barrels that he purchased from this or he hauled off from a neighboring business that summer. But didn't Combs testify that he got the barrels from his brother? Right. He did. That's what Combs' testimony was. He believed that the barrels came from his brother's house. That's right. So how many of these barrels are there? Well, one of the people, one of Combs' employees testified that there were these large drums all over the place at this industrial complex. But when they raided the complex, were there other barrels there? Or were these all the barrels? Well, I don't think that was in evidence, but I don't, I know that. Well, if there were other barrels, they didn't have meth in them, or there would have been in evidence. I suppose so. I suppose so. But I'm giving you the, let's say, I'm assuming that everything that the government, that the government witnesses testified to is the, let's just assume that that's all the correct, you know, those are the operative facts. If that's the case, then they started out with, you know, these, well, no matter what, we know that there were two barrels that were full of stuff, one of which had nothing to do with meth, or had no meth in it, and the second one had only traces in it. There's no question about that. And there's no question that they were destroyed because they were hazardous, apparently. So then in this context, look at. Is there any other physical evidence that Judge Thompson mentioned that one of the barrels had the coils in it, which are compatible with use for production of methamphetamine? Right. Is there any other physical evidence of any kind other than the testimony of the three witnesses, the jailhouse informant, the Floyd, and the police officer? The other physical, there was other physical evidence. And Floyd testified that before Combs gave him these barrels, he gave them a cardboard box to dispose of, and that when he turned it over to police or to the agent, they found some meth residue on the material that was in that cardboard box, and a DEA expert testified that it was his belief that the contents of this carton were associated with methamphetamine manufacture. And then there was, I think it was about a year, I think it was shortly before, let me just say, in February of 2001, Floyd testified that Combs gave him a baggie containing .64 grams of methamphetamine. But it's important to remember that the court instructed the jury that the charged offenses were only related to this August 2, 2000, to the August 2, 2000 activities. The jury was expressly instructed that it could not convict Combs based on the contents of this cardboard box or the meth. What evidence was there? That's a little odd, but the charge was August 2 that he manufactured it, even assuming that that means on or about August 2. What evidence was there that there was manufacturing activity on or about that date? I don't think there was any. There was nothing that I'm aware of. I mean, it was, you know, apart from this, apart from him giving Floyd the cardboard box two weeks earlier, there was also, in October of 2000, that's two months later, there was a telephone conversation between Combs and Floyd that was intercepted concerning possibly selling Combs some hypophosphorus, which experts testified is a precursor of methamphetamine. I don't believe there was anything in the record pointing to manufacture on August 2 except for this disposal activity. So it's clear that disposal took place on August 2. Yes. We have a transcript of that. Yes. And then the evidence that Combs was manufacturing methamphetamine was the DEA agent's testimony that he admitted it. That's exactly right. That's exactly right. And did that testimony include that he admitted it on or about August 2? No. But it was harmful nonetheless. No, no, no, no. We'll get to that issue. Oh, yes. No, they did not. That's correct. They did not. The only date that was specifically addressed in Agent Bailey's interview of Combs, I believe, is Bailey asking Combs, isn't it true or didn't you last manufacture on or about August 5, which was a little over two weeks before he was finally arrested. Bailey himself testified that it was he, Bailey, who brought up that date, and Combs, according to Bailey, said yes. So there was nothing about August. That's 10 months later, right? That's exactly right. A year later. The first the indictment refers to August 2, 2000. He was getting. Did Bailey testify that there was any admission to manufacturing on or about August 2? No. In the prior year? No. Okay. That's just a very strange case. Now do you want to get to the issue of the. The guessing error? Yeah. Yeah, well, you know, there's no. The government admits that it was error. Yes. Yes. To ask him to say that the officer was a liar or was lying. Right. And I assume the government then admits it. Well, they claim that discussing it in rebuttal. I mean, in the closing argument was invited. But let's ignore the second half for a moment. Let's assume that it was error to have the defendant. Say that the. Officer was a liar and that it was error to vouch for the officer. In effect, in the. In the closing. Why do you think that that is reversible error? Plain error. I think it's reversible error under the rubric of guest in because guest in held. Reasonably that in a case where witness credibility is paramount and the jury is charged with having to decide between two conflicting versions of the facts. This type of error can be plain error. Here with the incredible dearth of physical evidence. The dearth of the type of witness evidence that you would normally see in a case like this. The defendant's alleged admission that he was a manufacturer. Whether or not it's, you know, he admitted that he did it in August of 2001 or back in August of 2000. It's really irrelevant. His admission to that officer was just devastating. There is no way based on this scanty record that Combs could have been convicted of manufacture without that admission. And the only, look at the witnesses in the case. You've got Floyd who has, you know, tremendous motive to lie, we know. And he admits on the witness stand after Combs gave him that cardboard box back in July. He delayed giving it to the officers for a week while he was on a crack binge. Let's suppose the jury, and I'm sure this was argued in court, suppose the jury believes Floyd. Well, it really doesn't matter because Floyd didn't testify that Combs admitted having manufactured back then. You're right. I mean, maybe I'm casting aspersions on Floyd when I really don't need to. No, you're going to have to cast aspersions on Williams. I'm about to do that because I need to do that. But Williams, you know, what the government argued, you know, as of course the government does in cases where the defendant testifies and they're, you know, sort of they're arguing that there's a credibility battle. Well, Combs has a motive to lie. He's facing two felony charges. Of course, he did have a motive. But look at Williams. He was already on probation in another drug offense. He was facing a life sentence. He had a lot of motivation. He had this much motive. That's exactly right. So who are we left with? Agent Bailey. It doesn't mean that you throw out his testimony. No. The question is, is it, you know, reasonably likely that the testimony that Bailey was, should be believed, not Bailey, but the Williams? No, back to the officer. Oh, Bailey. Agent Bailey. Bailey should be believed. Is it reasonably likely that that had an effect on the outcome? And do we assume that the jury would have believed the other witnesses, or do we just look at it as, well, you know, the other witnesses had a motive to lie, and so did the defendant? How do we view the remaining testimony? Well, I think we have to say, let's look at all the witnesses who testified against Combs, see if there is anybody else who is essentially unimpeachable or see if there's more. Well, the question is, is it a close case? It definitely is a close case. Well, no. In determining whether it's a close case, do you assume the jury believed the other witnesses? I think you've got to, let's say this. We have to assume that they followed the Court's instruction to view their testimony with caution, because, A, they were felons, and, B, they were paid in favors for their testimony. And there was no comparable instruction given with respect to Bailey. So let's just say, let's say they looked at them, you know, they weren't sure. We know they had to view their testimony with caution, and that alone would have been, could have been enough to raise a reasonable doubt. Remember when the, you know, proof beyond a reasonable doubt is where we're at, even though the prosecutor's argument improperly sort of shifted, tried to shift that to, well, you know, who was the liar? Okay. Well, we really have two different questions, and, you know, one is, in evaluating prejudice, how do you, what do you assume about the rest of the testimony? And the second question is for sufficiency of the evidence. I think... And there, for sufficiency of the evidence, don't you assume that the jury did believe the other witnesses? Or at least that that testimony is critical? They certainly could have, but they were instructed to view it with caution. Can I ask you one final question, please? Yes. This, the jury came back at some point and said they were deadlocked. That's right. Was that on the, deadlocked in general or on the manufacturer? On the manufacturing count. The manufacturer. And I think that that's, that that's critical. Gaston says, you know, we can look at the comparative strength of the cases, and certainly one way of gauging that is whether the jury, you know, rushes to reach a verdict or doesn't. And they initially could not reach a verdict on the manufacturing count. I mean, it was, the evidence is so scanty. This is like, I've never seen a weaker manufacturing case. And when you have not just an agent, but the investigating agent, a guy who is sitting in court for the entire time, and you are told that you are, you are told by the government that it's, that you can't go by the defendant's story or acquit the defendant unless you find that this man who's sitting there beaming at you is a perjurer, and you add to that the argument that he, if he, he could never have committed perjury because he would have been fired if he, if he did so, there's just no way to look at this as other than prejudicial. And I think that's all. Okay. I think we've more than used your time, and we're well into the afternoon. Good afternoon. Good afternoon. May it please the Court, I'm Assistant United States Attorney Cheryl Murphy, and I'll be arguing on behalf of the government in this case. And for the record, I was trial counsel below. And as we conceded in the district court, the government concedes that the Sanchez slash Gueston error was made. And I apologize to the Court for that. That was my error. I would like to, before addressing the issues particularly raised in the brief, I'd like to address some of the issues that the Court raised with defense counsel. With respect to the evidence that the defendant manufactured on or about August 2nd of 2000, there was a time frame within which, if the jury believed the government's evidence, which it appears they did, there was a time frame within which the defendant had possession of those barrels. Earl Floyd testified that he received the barrels from Steve Reeves early in the year 2000 and that they were half full of oil, that at that time he sold them to the defendant believing that the defendant could use the oil in his business. Between that time and August 2nd, 2000, is the time that the government believes the defendant manufactured the methamphetamine. And that window is sufficient to place him on or about August 2nd with the methamphetamine. When was it delivered to him? In early 2000. So that, any time in the year 2000 is on or about August 2nd? I think that, I believe that there's case, although I wasn't prepared to address this particular issue, I believe this Court has found that a seven-month period can be on or about. Ms. Murphy, I may have misunderstood you. I thought you said it was early in 2000 that Coombs received the barrels from Floyd. Yes. Okay, and then, but what happened is that later Coombs gave the barrels to Floyd, told him to dispose of them, and at that time there was a trace of meth in one of the barrels. At that point, at least one of the barrels had the methamphetamine. When did that happen? That happened at some point in between the time he received the barrels from Floyd. Between early 2000 and August. And August of 2000. How did the government prove that it happened then and wasn't contained in the barrels at the time that Floyd provided them to Coombs? Well, there was no, I mean, the only evidence in the record was that at the time Floyd provided them to Coombs, they contained oil in them. Right, but then when they were disposed of, they also contained oil and some other things. Well, and there was evidence that the defendant admitted to Williams that the barrels contained methamphetamine waste or oil, tubing, et cetera, in them. So I don't think there was any indication that the methamphetamine waste was in the barrels when the informant gave them to the defendant. And that wasn't the defendant's position at trial either. No, I understand that, but it just doesn't make sense to me that the very person who informed on him was the one who provided them with the barrels in the first place. Well, the defendant admitted that, and it's in the record at, I think it's page, the government's executive record, page 524. The defendant admitted that it was quite possible that Floyd did sell him the barrels for the oil and testified that he often bought things from the informant merely for the purpose of helping out the informant. Right, but that still doesn't tell us what was in the barrels at the time they were delivered to Coombs. I mean, all you found was a trace of methamphetamine. Couldn't it have been in there when they were delivered to Coombs? I don't believe there's any reason to believe that. The only testimony that we have of the contents of the barrels when they were given to Coombs was Steve Reeves, the original owner of the barrels, and Earl Floyd, who gave them to the barrels. And then the defendant's admission that, you know, it's not unlikely that he would have purchased barrels of oil from the defendant. With that said ---- But let me go back to it. You say you believe there are cases that say 7 months. It complies with the honor of that. I believe that that's correct, Your Honor. I didn't check that, but I was just curious. With respect to the issues that I intended to address, there's three issues that I'd like to focus for the Court, and the first, obviously, being the cross-examination of the defendant. I think it's important to note the Court asked how do you, when evaluating prejudice, how do you view the rest of the evidence, and what assumptions do you make about what the jury believed. And I think a great indication here is what the district court, who's entitled to deference and who was in a better position to evaluate the effect of any of the errors, determined. And in evaluating this very issue, the district court determined that this case was more like the Sullivan case, an out-of-district case. The Sullivan case, where it was clear, it was clear already that there was this contradiction between the defendant's testimony and the government's evidence, and that the improper question really was merely pointing out what was already an obvious distinction in the testimony. In addition, this case is distinguishable from Guestin in four ways. First, the strength of the government's case. And I disagree that this was an outrageously thin case here. There's a really determined question of whether it was prejudicial, the strength of the case. Yes. Yes, Your Honor. And in this case, the district court determined that the government's case was strong, independent of the improper questioning and cross-examination. In Guestin, the district court made exactly the opposite conclusion. The district court in Guestin concluded that it was a closed case and that the only difference between the first mistrial and the second trial that ended in conviction was the improper cross-examination. That's not what we have here. Although the jury did return a verdict initially saying that they were deadlocked on the manufacturing count, they had been deliberating at that point for so briefly Three hours. Three hours. And it was late in the afternoon on a Friday. I would submit to the court that common sense would indicate they were prepared to split the baby, return a conviction and go home. Well, if they were prepared to do that, they could have just acquitted on one and convicted on the other if they were prepared to split. Well, they were clearly prepared. They could have done that, but they were convinced on the first count. I mean, I think that even the court, even the district court didn't view the jury's position at this point as particularly serious. She did not even give them an Allen charge at this point. She merely instructed them to come back on Monday. At that point, they took a look at some more evidence and ultimately reached a verdict. So this case is not as close as the Guestin case was. The second difference between this case and the Guestin case is the extent of the questioning. In the Guestin case, the prosecutor ---- Now, you keep talking about that, but I think you just agreed that really what decides this case, assuming as we do that there's error in the, you know, telling them that you have to believe the officer and the closing argument. The question is, did that prejudice the defendants to be reversible? Is it plain error? And I think you said that really the key to that is how close the case was. Was it a close case or was it a slam dunk or somewhere in between? And I think the most helpful thing is you're telling us why you think it was such a sure case that the district judge, who didn't think it was close, why she's right about that and why your opponent, who says there's nothing to this case except the confession to the officer, why that's wrong. I would be happy to do so, Your Honor. In this case, first of all, I'd like to point out that the error in the cross-examination here had to do with conduct, uncharged conduct. There was, although it was circumstantial, there was strong evidence supporting the defendant's guilt on the charged conduct. There was the physical evidence, the barrel containing the methamphetamine waste, the manufacturing equipment. Although that waste wasn't preserved, the record reflects it wasn't preserved because it was eating through the container, and the hazardous materials team had to add some more chemicals to even out the acidity, so it couldn't be preserved. But there were photographs and there was chemical analysis. There was also the 404B evidence, the methamphetamine in the baggie that the informant – I'm sorry, the defendant gave to the informant. There was the cardboard box that the defendant gave to the informant. And there was the defendant's voice on the two tape recordings, one in which he discussed – he instructed the defendant to dispose of the barrels and wipe all of the fingerprints off of the barrels, and another in which he discussed obtaining a precursor chemical for the manufacture of methamphetamine. Although the informant, certainly no model citizen, although his testimony should have been, and the jury was instructed that it should have been viewed with skepticism, on the important points, it was corroborated by the tape recordings, by the chemical analysis, and by the defendant's admissions to the other witnesses, Williams and Bailey. Williams and who? Williams and Bailey, Special Agent Bailey, the case agent. There was the expert testimony of the chemist and of Special Agent Connors regarding the contents of the barrel. Now, Special Agent Connors' testimony is important because he testified – and this goes to the amount of manufacturing issue – he testified that the hazardous materials team took representative samples throughout that liquid. So it's not reasonable to infer that there was – the majority of it was oil and there was a little bit of meth waste in there that couldn't have led to the production of 500 grams of methamphetamine. There was also the defendant – I'm sorry. There was also the cooperator's testimony, Defendant Robert Williams. And again, although Mr. Williams had a lot at stake and had a lot to gain here, his testimony was corroborated in the important ways. It was consistent with evidence that he would have no other way of knowing about had the defendant not made those admissions to him. I believe at some point the defense raised the specter that Mr. Williams could have known this through reviewing the discovery materials, but the defendant himself testified either that he didn't get all of the discovery materials himself and that what he got he flushed down the toilet with another inmate. Well, what was it that corroborated Williams? What corroborated Williams was the consistency between the evidence that he had and the facts. There was the amount of manufacturing that he said the defendant admitted he could make, 4 to 5 pounds, which was consistent with Harry Skinner's analysis that the amount of meth waste likely came from 4 to 5 pounds of production and that the equipment within the barrels was consistent with the production of 4 to 5 pounds of methamphetamine. There was the fact that Williams knew the grace of the informant and that he was a drug user, a crack smoker. There was the fact that Williams knew that the defendant intended to shift the blame for the methamphetamine waste to his brother. There was also Mr. ---- Wait. What does that show? That shows that the Williams ---- So the defendant said that he bought it from his brother. That's his testimony, right? I mean, he got the barrels from his brother. That is his ---- Well, that is his testimony. His testimony was that his ---- So he may have told Williams, I'm innocent. I got these barrels from my brother. What does that prove? I don't think I follow the Court's question. Are you saying that the possible alternate explanation for Williams knowing that the defense would be that it was his brother's manufacturing was not, in fact, the defendant's own admissions, but was ---- Not admissions. The defendant's own declarations that he was innocent. That's possible, Your Honor. That is possible. That's possible. But I think consistent with the other evidence, it's ---- Does the defendant deny that he ever talked to Williams at all? Yes. The defendant said he wouldn't talk to Williams, that he didn't like that man and that he didn't associate with him when they were in prison. In addition, there's the hazardous materials team worker, Mr. Berumen's testimony, that flatly contradicted what the defendant told the jury about the origin of the barrels, that his employees had gone to the brother's house and removed the barrels and the cardboard box. That was the defendant's original testimony. When after Berumen testified that he made sure there were no materials left at the brother's lab when they cleaned that up in 1998, then the theory of the defense changed in closing argument and turned to, oh, no, no, those barrels had been waste from David Combs's manufacture at the defendant's business compound. What about the fingerprints on the barrels? You said wipe the fingerprints. That could have been consistent with, you know, I don't want to be tied to disposing with hazardous waste material. What do you make of that? It could ---- Like many things, Your Honor, that's correct. There are ---- when viewed in isolation, there are other possible explanations for certain pieces of evidence in this case. But that's by nature the nature of a circumstantial case. And when you add those up together and when you view them in the light most favorable to the government, a rational juror could have easily ---- Is that what we do when we review for plain error? I think the final question is we have to determine whether it would result in a miscarriage of justice if the conviction were not reversed. Something to that effect. That's correct, Your Honor. The other standard is with respect to the issues raised about the sufficiency of the evidence. But with respect to the effect of the cross-examination and the closing argument, that's correct. It's an even more serious standard of whether it would result in miscarriage of justice to allow the conviction to be reversed. I don't understand that standard. I mean, there are so many standards and there are so many levels to standards. But I don't understand the final step of plain error to mean that it's an actual innocence case, that you have to conclude that the defendant was innocent. It could be a miscarriage of justice if you convicted somebody with dubious evidence and where it was not clear beyond a reasonable doubt that he was guilty. That might be a miscarriage of justice as well as convicting an innocent person. Yes, that's correct, Your Honor. And I didn't mean to imply that it was an actual innocence standard. But even under the Court's definition, this case, the isolated errors in this case, as the district court found, don't amount to. The district court, though, I know the district court found that the line of questioning wasn't improper. But the district court actually participated in the line of questioning. And I find that a little troubling, that, you know, she actually, I mean, twice interjected herself into this line of questioning. When you were saying, my question was, are you saying that he lied? And he's saying, I'm saying that what is written on that paper is not what he said. The court injects there, don't worry about that. And then the witness is, the witness still is trying not to have to say that he lied. And the court says, well, that's what she's asking. And then he finally has to say, well. So there's kind of a, I mean, when you talk about appearance of justice issues, there's kind of a problem with the judge ruling on the new trial motion saying it's not improper when she was involved in it. Well, I agree with the Court that certainly it would have been better were the district court not involved in the questioning. And it would be more problematic if this were the only instance in which the district court had chimed in during cross-examination. Why? Why would that make it more problematic? Well, because I think that would emphasize this portion to the jury and emphasize to the jury that it was important that the defendant answer these particular questions. It's just that we all know when a judge kind of gets involved in it, it does have a stronger impact on the jury. Yes, that's correct, Your Honor. But in this case, this was a particularly, this was a defendant who was particularly reluctant to answer the questions posed to him. I'm not sure I would have wanted to answer the question saying the agent was lying. Fair enough on that point, Your Honor. However, even absent, first of all, there were, as to your first point, Your Honor, there were seven other instances when the district court had to instruct this witness to just answer the question. So I think that that minimizes any effect of her, of her interjection on this particular question. And second of all, even absent my direct question to the defendant, was Special Agent Bailey lying when he said that you admitted manufacturing methamphetamine on August 5th, just of 2001. Even absent that, there were, through the defense, through the defendant's direct testimony and through his earlier answers to proper questions on cross-examination and in his rebuttal testimony, the sum substance of his testimony was that Special Agent Bailey was lying about all the statements that he made in his confession. So I don't know that this defendant was particularly reluctant to call Special Agent Bailey or Williams or Floyd a liar, although it was improper to force him to do so explicitly. But I began to be more troubled by that issue when I was wondering how it could be that a competent U.S. attorney from this office in particular would make that mistake. And it does seem more likely that you would, that one would pursue and make that mistake if the judge was sitting there participating in the error, you know. Well, certainly no one in the courtroom at the time was aware of the error. And in an effort, I'm out of time, but if I could just advise the Court that our office has taken steps to remedy this, and this particular issue has been addressed not only in an office-wide e-mail, but it's been added to our training manual to ensure that this type of error doesn't occur. Well, the judge had been the U.S. attorney, and she said she wasn't aware of the law. So if the head of the office wasn't aware, it's not surprising that a younger lawyer wasn't aware. I don't think anybody's concerned at this point about your conduct or that it wasn't simply inadvertent. That's not an issue, and nobody has any doubt about that. But nevertheless, the question is whether it was harmful. And, you know, occasionally cases get reversed because of errors. And it's not the end of the world. You get to try it again, maybe. Are there any other questions from the Court? Thank you, Your Honor. Oh, are you through? Are you getting up? No, no. We're getting through. We didn't mean it. Let me ask the Court one more question. Did the Court have any questions about any of the other issues, the sufficiency, the 500-gram evidence, which I thought was extremely interesting, or the propriety of charging the disposal-related conduct as distribution? I found it sufficiently addressed in the briefs. I think those are issues we could take care of by reading the briefs. No. The issue in which we were interested in the oral argument was this, basically the related issues, the ones we've been discussing, were the sufficiency of the evidence on the manufacturing and the effect of the errors in cross-examination and closing argument. Well, I would just urge them that the Court's language in Gaston be a lodestar in deciding prejudice here. They said, ultimately, in a case where witness credibility was paramount, it was plain error for the Court to allow the prosecutor to persist in questioning in this fashion. I just don't see any way one could look at these facts and not conclude that witness credibility was paramount here. You know, when the government tries to excuse the questioning, saying, well, she was just following up on Combs's statements that he didn't say exactly what the agent said, he said, of course. That's the only circumstance in which that breed of error could ever occur. Otherwise, it would just be total nonsense. And I think the point that Judge Wardlaw made about the district court's own involvement in the questioning is tremendously important. Of course, when the district court elicits the testimony, and she was the one who ultimately elicited the testimony, albeit I'm, of course, in good faith, but she was the one that brought this out, it's like a gong going off telling the jury, this is important. You know, you were being evasive before. That was wrong that you didn't answer it, and now, finally, we've got you. You, you know, Dale Combs said that Agent Bailey is a liar. And then, boom, the government seizes on that to do exactly what every one of these cases and the other circuits that the Ninth Circuit relied on, and in this Court's own jurisprudence, said it shouldn't do. The argument pitted a criminal defendant, one with no prior convictions, I might add, against, but, you know, on trial for serious felonies, against an agent, and then, of course, the coup de grace, the vouching. Why would this agent want to lie about this nice, grandfatherly man? Especially, you know, we can be darn sure that if he committed perjury, if Bailey committed perjury, he'd be fired with, you know, zero, zero information in the record. And, you know, I'm happy, that's great that the government is now including this in their The defense lawyer. Well, yeah, I didn't even want to admit, that's a whole other enchilada here, but we won't, we won't go there right now. But, you know, the issue is, was credibility a key issue in this case? Of course it was. And I'd urge the Court to explain that. And credibility, but credibility over whether he admitted to the offense, which is somewhat important question. Okay. Thank you very much. Thank you. The case just argued will be submitted at one more. Oh, we've got one more? Yes.
judges: Reinhardt, Thompson, Wardlaw